[Cite as *State v. Portis*, 2021-Ohio-608.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28677 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-3170 |
| | : | |
| JARYLD PORTIS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of March, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JOHNNA M. SHIA, Atty. Reg. No. 0067685, P.O. Box 145, Springboro, Ohio 45066
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Jaryld Portis appeals from his convictions for felonious assault and aggravated robbery. Portis claims the State did not present evidence sufficient to support his convictions and that the convictions were against the manifest weight of the evidence. He also claims the trial court abused its discretion when instructing the jury on complicity. Finally, Portis asserts that prosecutorial misconduct and cumulative error resulted in an unfair trial.

{¶ 2} This court has reviewed the record and concludes that Portis's assertions lack merit. Accordingly, the judgment of the trial court is affirmed.

## I.     Facts and Procedural Background

{¶ 3} On September 24, 2019, Willie Smith and his cousin Errick Coleman were assaulted, and Smith was robbed. Following an investigation, Portis was identified as the assailant. On October 2, 2019, Portis was indicted on two counts of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2), two counts of felonious assault (serious harm) in violation of R.C. 2903.11(A)(1), and two counts of aggravated robbery in violation of R.C. 2911.01(A)(3).

{¶ 4} The matter proceeded to a jury trial. In the State's case, Smith testified that he managed a rental property located at 78 and 80 Pointview Avenue in Dayton. The property, a duplex, housed two families. Smith testified that Portis and Melinda Sturgill moved into 80 Pointview Avenue a few months prior to the September attack.

{¶ 5} Smith was 80 years old, and therefore his cousin, Coleman, helped him with maintenance of the properties. Smith testified that he picked up Coleman around noon on September 24, 2019, and the two went to the Pointview duplex to collect rent. Smith

testified that the 78 Pointview tenants and Sturgill met him outside and each paid him $550 in cash for their rent. He also testified that he and Coleman were ready to leave the duplex when Portis arrived in a vehicle; Portis informed Smith that he believed there was a problem with the fuse box, because the kitchen lights in his unit were not working properly.

{¶ 6} Smith testified that he and Coleman descended into the basement and were looking at the fuse box when the lights by the stairs went out. Smith then observed Portis turn off another light which was near the fuse box. Smith testified that Portis "started chopping me in the head" with something that felt like a machete. Smith admitted he never saw the weapon used against him and did not observe who was hitting him. Smith put his hands up to protect his head and then his finger was cut, resulting in the finger being severed. Smith did not know how many times he was hit with the weapon. He testified that he fell to the floor and was still being hit when his assailant went through his pockets and removed the rent money and other items; the assailant then left, and Coleman helped Smith up the stairs and out of the unit. Once outside, they asked neighbors to call 911. Smith sustained lacerations to his head which required approximately 37 staples to close. He also sustained a skull fracture and the loss of his finger. He remained in an intensive care unit for several days.

{¶ 7} The State also presented the testimony of Coleman. Coleman confirmed that he accompanied Smith to the duplex on September 24, 2019. He further testified that Sturgill brought her rent money to the car and stated that she was $20 short. Smith and Sturgill agreed she could pay the additional money the following day. Coleman testified that Portis then pulled up to the duplex in a tan Lincoln vehicle. Portis informed Smith

the kitchen lights were out and stated his belief there was an issue with the fuse box and he did not know how to fix a fuse.

{¶ 8} According to Coleman, he, Smith, and Portis went into the basement; the only entrance to the basement was through the unit, and the other duplex's tenants could not access Portis's basement. Coleman testified there was a light switch at the top of the basement stairs, which controlled a light near the stairs, and another light further into the basement near the fuse box, which was controlled by a pull string. According to Coleman, the light in the basement was dim, but he was able to see. However, he had to use the flashlight on his cellphone in order to read the numbers on the fuse box, because the numbers were small. Coleman testified that Portis stated he was going to retrieve a flashlight. A few moments later, as Coleman was looking at the fuse box, the light near the stairs went out, and then the light near the fuse box went out. Coleman then felt something strike his head several times. He testified he observed the weapon, which appeared to be a machete or some type of knife. Coleman testified that, as he turned toward his attacker, the light on his phone shone on Portis's face. Portis then hit Coleman in the face. Coleman testified that Portis also hit Smith and took the rent money from Smith's pocket. Portis then ran up the basement stairs. Coleman testified he and Smith left the house and asked neighbors to call 911, because his (Coleman's) cell phone had been damaged during the assault. Coleman testified that he was hit approximately 13 to 15 times. During the attack, both his skull and jaw were fractured, he suffered multiple lacerations to his head, and he suffered a bleed in his brain. He remained in intensive care for several days.

{¶ 9} Dayton Police Department Officer Justin Hayes testified that he was on

routine patrol when he received a dispatch regarding a stabbing at 80 Pointview Avenue. When he arrived at the scene, he observed two older men seated in a Jeep and being attended to by emergency medical technicians. Hayes observed that Smith was missing a finger and had "numerous severe injuries to his head[.]" Tr. p. 92. Hayes described the wounds to Smith's head as "divots in the back of his scalp and skull." *Id.* According to Hayes, Coleman had similar injuries to his head, and the "left side of his face was starting to puff out grotesquely as though he had a fracture in his jaw or possibly [his] orbit area." Tr. p. 93. Hayes testified that he asked Smith what had happened, and Smith indicated Portis had assaulted him and stolen his money.

{¶ 10} Hayes called for backup because he did not know whether the suspect was still in the home. Hayes testified that, upon the arrival of the backup officers, they called out for anyone in the unit to exit and Sturgill came out. Sturgill informed Hayes that Portis was driving a Lincoln Town Car with license plates which belonged to a different vehicle. Hayes put out a broadcast with the description of the car.

{¶ 11} Hayes testified that he then reported to Miami Valley Hospital, where he took a statement from Coleman. Hayes testified he was able to see Coleman's skull through the injuries to the scalp. Hayes also took a statement from Smith. Hayes testified that both men were lucid when he spoke to them, and both men identified Portis as the attacker.

{¶ 12} Dayton Police Lieutenant Randy Beane testified that the next morning (September 25, 2019), he was on routine patrol at 1:30 a.m. Beane was traveling north on Riverside Drive; when he passed through the intersection with Helena Street, he spotted a car stopped at a red light on Helena Street that matched the vehicle description

given by Hayes. Beane testified the car's lights turned off as it turned onto Riverside Drive. Beane called for assistance, turned around, and began to follow the car. Another officer who was located further down Riverside Drive placed stop sticks across the road.[1] As the Lincoln approached the stop sticks, Beane activated his cruiser lights and the car began to flee. The car crossed the stop sticks but continued on, reaching a speed of 70 m.p.h. The car also ran a red light and crossed over into the oncoming lane. Beane decided to use the front of his cruiser to hit the rear of the Lincoln, causing it to spin out and finally come to a stop. Beane testified that by the time he was able to exit his cruiser, the driver of the car had fled into the woods. A female passenger, later identified as Cora Pendal, was found in the vehicle. Beane testified other officers began to chase the driver.

{¶ 13} Dayton Officer Chelsea Weitz testified that she responded to the area where the car chase ended and began searching the area. After being informed the suspect had jumped into the river, she observed wet footprints on the adjacent bike path. Weitz and another officer followed the footprints and ultimately found Portis lying in a bushy area. Portis was arrested and transported to the Safety Building.

{¶ 14} Dayton Police Detective Rod Roberts testified he interviewed both Portis and Pendal. During Pendal's interview, it was determined that Portis had just picked her up at a local hotel and was taking her home when the chase began. She informed Roberts that she asked Portis to slow down during the chase, but Portis merely told her to shut up.

{¶ 15} Roberts also interviewed Portis, who denied knowing how Smith and

---

[1] Stop sticks consist of spikes which cause a vehicle's tires to deflate in about one minute.

Coleman sustained their injuries. Portis admitted that he knew Smith and that Smith had recently asked him to prevent his dog from defecating in the neighbor's yard. Portis stated he was aware Sturgill had already paid the rent when he asked Smith to check the fuse box. According to Portis's statement to Roberts, Portis accompanied Smith and Coleman into the basement, then left the men in the basement and left the premises in the Lincoln automobile. Portis also stated that Smith and Coleman were still at the duplex when he returned. Portis told Roberts he left again because he had a woman in his vehicle and had to take her somewhere; he indicated that he did not return home after that and stayed at a local hotel that night. Roberts testified that he later went to that hotel and learned that, during the late evening on the day of the attack, Portis had secured a room for three days.

{¶ 16} In his defense, Portis presented the testimony of Sturgill, who stated that Portis was her fiancé. Sturgill testified that she and Portis moved into 80 Pointview in the last week of July 2019. According to Sturgill, she had worked the night shift and arrived home at 9:00 a.m. on September 24, 2019; Smith came for the rent money at approximately 10:30 a.m., and she was only able to pay him $530. Sturgill stated that Smith agreed to let her pay the remaining $20 the following day. After paying Smith, Sturgill went upstairs and went to bed. Sturgill testified that she was asleep when Portis called her on her cellphone and stated that the landlord had "asked him to make sure the dog was in the house because they were about to cut the grass." Tr. p. 273. According to Sturgill, she brought the dog into the house through the back door, locked the door, and went back to bed. Sturgill further testified she was again awakened by Portis, who asked if she knew where to find a flashlight. She indicated she did not know and then

tried to go back to sleep. When she heard voices, she walked downstairs and observed Portis, who informed her that "the landlord and the other person were there looking at the fuse box." Tr. p. 276. She testified that Portis then walked up to the second floor, and she followed him; Portis then informed her that he was leaving, and he walked back downstairs and out the front door. Sturgill testified she heard a car start and drive away, at which point she went back to her bedroom, locked the door, and once again went to sleep. Sturgill was awakened again when the dog, which was in its cage on the first floor, began barking. She testified she heard a door slam, and she again went downstairs. According to Sturgill, both the front and back doors were open. She went to lock the back door and observed Smith and Coleman; she described both men as bloody. Sturgill asked the pair what had happened and whether they were okay. She testified that Coleman stated that they were okay, and the two men walked out of the unit.

{¶ 17} Sturgill testified that she observed neighbors outside and then went upstairs to get dressed. She then heard a voice over a loudspeaker asking anyone inside 80 Pointview "to come outside with their hands up." Tr. p. 280. Sturgill went outside and was handcuffed. She testified she did not know where Portis had gone, but she told the police he was driving her Lincoln Town Car. She told the police the license plates on the car had been on her prior car. She also attempted to call Portis, but her call went straight to voicemail. She then texted Portis stating "that something had happened to the landlord, and that the police were asking about him, and [she] was scared." Tr. p. 282.

{¶ 18} Portis also testified at trial. He stated he made breakfast when Sturgill arrived home, then walked outside to go to the gas station; he saw Coleman and Smith, who asked him to put his dog away. Portis testified that he called Sturgill from outside

the house and told her to put the dog inside.   He then went to a gas station on Siebenthaler Avenue.   On his way home, Portis stopped at a store on Pointview Avenue because he was flagged down by a woman he knew as Ginger.   According to Portis, Ginger told him she needed a place to stay.   When Portis informed Ginger she could not stay at his home, she asked him to take her to a hotel.   She also stated that she did not have any identification with which to secure a hotel room.   Portis testified that he drove back to his home in order to get his identification.

{¶ 19} According to Portis, when he pulled up to his residence and exited the car, Smith called him over to his car.   Portis stated Smith asked him to stop letting his dog defecate in the neighbor's yard.   Portis then informed Smith that one-half of the kitchen did not have electricity and that he thought a fuse had blown; Smith told him Coleman would look at the fuse box.   Portis indicated that he went inside and placed his dog in a cage, then he unlocked the basement door and accompanied Smith and Coleman into the basement.

{¶ 20} Portis testified that the basement was dark, so he and Coleman used the flashlights on their respective cellphones to light the area.   Portis testified that he asked the men if they wanted a flashlight, and one of them responded affirmatively.   Portis went upstairs to find a flashlight, but he was unsuccessful.   He then went to the second floor and asked Sturgill where he could find a flashlight.   When Sturgill stated she did not know where to locate a flashlight, Portis informed her that he was leaving the house.   Portis testified that he wanted to leave quickly because he did not want Sturgill to see the woman who was still in his car.   Portis testified that when he left, he went to his mother's home for a few minutes and then to the Dayton Motor Hotel on Keowee Street; Portis secured

a room with his identification, and Ginger paid for the room. At some point thereafter, Portis received a text from Sturgill indicating that the police were searching for him. Portis testified he also received a call from a neighbor, who told him the police were at his (Portis's) home.

{¶ 21} According to Portis, he parked his car and started walking and praying; he wanted to find out what was going on at home, but his phone had no power. Portis stated that he went back to the Dayton Motor Hotel, but because Ginger was a drug addict, he did not want to stay there. Portis eventually left the hotel in his automobile and encountered Cora Pendal as he was driving on Lance Street; Pendal asked for a ride to a gas station. As Portis was driving her to the gas station, he observed Beane's cruiser. Portis testified he did not pull over for the traffic stop because he knew he had an active warrant against him and he did not want to go to jail.

{¶ 22} Portis also testified that he was left-handed and his left arm had been previously wounded when he was the victim of a shooting. Portis stated the injury to his arm limited his strength and mobility in that arm. He stated he could not shoot a basketball because he could not lift his arm up without feeling pain.

{¶ 23} On cross-examination, Portis testified that he rented the hotel room for Ginger at 12:40 p.m. When asked why he turned off his vehicle's lights when he was being pursued, Portis stated that he did not realize he had turned the lights off and must have panicked. Finally, he admitted he had a prior conviction for robbery.

{¶ 24} Portis was found guilty on all four counts of felonious assault and one count of aggravated robbery. The jury found Portis not guilty on the count of aggravated robbery relating to Coleman.

{¶ 25} At sentencing, the counts of felonious assault (serious harm) were merged with the counts of felonious assault (deadly weapon), and the State elected to proceed to sentencing on the two counts of felonious assault (deadly weapon). The trial court imposed an eight-year prison sentence on each count of felonious assault and an 11-year sentence for the aggravated robbery. All of the sentences were ordered to run consecutively, for an aggregate minimum prison term of 27 years and an aggregate maximum term of 32.5 years.

{¶ 26} Portis appeals.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 27} The first assignment of error asserted by Portis states as follows:

THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO SUSTAIN PORTIS'S CONVICTIONS.

{¶ 28} Portis contends that the State did not present evidence sufficient to support his convictions and the convictions were also against the manifest weight of the evidence.

{¶ 29} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states:

An appellate court's function when reviewing the sufficiency of the evidence

to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

{¶ 30} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this situation, a " 'court [while] reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 31} Further, "[a]lthough sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). As a result, "a determination that a conviction is supported

by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 32} Also important is the axiom that "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 33} "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." *Id.* "Consequently, we defer more to decisions on what testimony should be credited, than we do to decisions on the logical force to be assigned to inferences suggested by evidence, no matter how persuasive the evidence may be." *State v. Brooks*, 2d Dist. Montgomery No. 21531, 2007-Ohio-1029, ¶ 28, citing *Lawson* at *4.

{¶ 34} Portis first contends that the State failed to present evidence sufficient to establish identification. In support, he claims the basement was dark, which prevented the two men from being able to see their attacker. He also notes that he and Coleman had not met prior to the day of the attack, that he and Smith had seen each other only on a few occasions, and thus that the victims were not "entirely familiar with [him] to be able to recognize him under the circumstances." He also claims the men did not identify him

as the perpetrator when they were questioned at the scene.

{¶ 35} During trial, Smith testified that the light near the basement stairs went out, and he then observed Portis turn off the string light, after which he was immediately hit. He testified he was hit multiple times and that the rent money and other items were removed from his pocket while he was being hit.   Smith testified he never saw Portis hit him because the basement was dark after the lights were turned off.   However, Coleman testified he was hit in the head and that, as he turned, he observed Portis, who then hit him in the face and fractured his jaw.   Coleman also testified that Portis hit Smith and took the money from Smith.   Coleman testified he had a good opportunity to observe Portis when Portis first approached the men outside the unit just minutes before the attack occurred.

{¶ 36} Officer Hayes testified that Smith and Coleman were still at the scene when they provided information identifying Portis as the perpetrator.   He testified they also identified Portis when he interviewed them later at the hospital.   Hayes testified Smith informed him that Portis was the assailant and that Portis took the rent money from him.

{¶ 37} Based upon this evidence, we cannot say the jury lost its way in concluding Portis was the principal actor in the attack on Coleman.   Further, Coleman's testimony supported a finding that Portis also attacked Smith.

{¶ 38} Next, Portis contends the State did not present sufficient evidence to establish that a deadly weapon was used in the commission of the assaults.   In support, he argues that no weapon was recovered and that there was no expert testimony regarding what caused the injuries to each man.

{¶ 39} R.C. 2923.11(A) defines "deadly weapon" as "any instrument, device, or

thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." "Committee comment on this generic definition points out that a deadly weapon is anything capable of causing death and is carried, possessed or used as a weapon such as a rock or cane when used for offensive or defensive purposes." *State v. Clark*, 2d Dist. Clark No. 1298, 1979 WL 208322, *1 (May 23, 1979). "Illustrations of things, innocent in themselves, that may be capable to causing death include a baseball bat, a Coke bottle, a toy pistol and an unloaded gun. The statute is not limited to instruments that are dangerous or deadly per se, but includes anything that may be possessed that has an actual or potential danger of serious or deadly harm under the circumstances encountered in a theft offense such as robbery." *Id.* In other words, "[t]he definition of deadly weapon in R.C. 2923.11(A) imposes two requirements of proof. First, the article must be capable of inflicting death. Second, the article must either (1) have been designed or specially adapted for use as a weapon or (2) possessed, carried, or used as a weapon. When use is a factor, the manner of its use and the nature of the instrument itself determines its capacity to inflict death." S*tate v. Schooler*, 2d Dist. Montgomery No. 19627, 2003-Ohio-6248, ¶ 21, citing *State v. Deboe*, 62 Ohio App.2d 192, 406 N.E.2d 536 (6th Dist.1977); *State v. Taylor*, 2d Dist. Greene No. 2018-CA-9, 2019-Ohio-142, ¶ 90.

{¶ 40} We first note that "expert testimony is only offered to assist the trier of fact, and such testimony may be believed or disbelieved by such trier." *State v. Coney*, 10th Dist. Franklin No. 94APA05-670, 1995 WL 65013, *4 (Feb. 16, 1995), citing *Vetter v. Hampton*, 54 Ohio St.2d 227, 230, 375 N.E.2d 804 (1978). Thus, contrary to Portis's suggestion, expert testimony is not required to establish that an instrumentality is capable

of causing death.   *Coney* at *4.   "Common sense and [the] experience of those upon [a] jury observing the instrument that was in the hands of [a defendant], under the circumstances as presented within [a] case, dictate the appropriate finding."   *Id.*

**{¶ 41}** Next, although no weapon was recovered and Smith did not see what the assailant used in the assault, there was evidence that Coleman observed a weapon he described as a machete or knife.   Smith also testified he was hit with something he described as feeling sharp, like a machete.   Further, the evidence demonstrated that the assailant hit both men with something that was capable of denting their scalps, caused serious cuts to their heads, and severed Smith's finger.   Both men sustained severe injuries which caused them to be hospitalized in the intensive care unit for several days.

**{¶ 42}** When viewed in a light most favorable to the prosecution, the record contains sufficient evidence that some instrumentality was utilized by the assailant as a deadly weapon.

**{¶ 43}** Moreover, the evidence in this record demonstrated that Portis used a deadly weapon to attack Coleman and Smith and that he removed money from Smith's pocket.   Based upon the evidence, we cannot say the jury clearly lost its way in convicting Portis.   The first assignment of error is overruled.

### III.    Complicity Instruction

**{¶ 44}** Portis's second assignment of error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT INSTRUCTED

THE JURY AS TO AIDING AND ABETTING ABSENT A COMPLICITY

CHARGE AND ABSENT SUFFICIENT EVIDENCE TO WARRANT THE

INSTRUCTION.

{¶ 45} Portis argues the trial court should not have instructed the jury on complicity to commit felonious assault and aggravated robbery because the indictment failed to explicitly indict on complicity and because the record did not support the instruction.

{¶ 46} Jury instructions "must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181, 657 N.E.2d 503 (1995). A trial court must fully and completely give jury instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact-finder. *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.

{¶ 47} We review a trial court's jury instructions for an abuse of discretion. *State v. Jones*, 2015-Ohio-5029, 52 N.E.3d 263, ¶ 13 (12th Dist.). An appellate court may not reverse a conviction in a criminal case based upon jury instructions unless "it is clear that the jury instructions constituted prejudicial error." *Id.* An appellate court's duty is to review the instructions as a whole, and, if taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found premised upon the possibility that the jury may have been misled. *Id.*

{¶ 48} Turning first to Portis's contention that a jury may not be instructed on complicity if the charging instrument does not contain such a charge, we note that this argument was rejected in *State v. Young*, 2d Dist. Greene No. 2019-CA-18, 2020-Ohio-1044, wherein we stated:

> The complicity statute, codified at R.C. 2923.03(F), provides: "[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal

offender."  In *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, the Ohio Supreme Court held that R.C. 2923.03(F) allows the State to charge complicity in terms of the complicity statute or in terms of the principal offense.  *Id.* at ¶ 181.  The court further held that R.C. 2923.03(F) "adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense."  *Id.* at ¶ 178-184, citing *State v. Keenan*, 81 Ohio St.3d 133, 151, 689 N.E.2d 929 (1998), citing *Hill v. Perini*, 788 F.2d 406, 407-408 (6th Cir.1986).  "Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated * * * in terms of the principal offense' and does not mention complicity."  *State v. Herring*, 94 Ohio St.3d 246, 251, 752 N.E.2d 940 (2002).

*Id.* at ¶ 8.

{¶ 49} We next address Portis's assertion that the State failed to present evidence to support its request for a complicity instruction.   Portis argues "the State did not provide any evidence of what, if any, part that Portis had in the commission of the offenses, nor how he assisted or facilitated, or promoted its accomplishment.  The State could not prove that there was another person involved to prove that Portis assisted that person. Without a principal offender, there is no complicity."

{¶ 50} During Smith's testimony on direct examination, the following colloquy took place:

Q:  Was it you or [Coleman] was [sic] struck first?

A:   I don't know, I – we both was [sic] struck.   It was – it was – it was as if it was two of them instead of one, instead of just one.

Q:   So you think there were two people doing it?

A:   I'm – I'm thinking it was, but I didn't see but one; and that was [Portis]. The other person; I didn't see the other person.   By that time, it was so dark in there.

Tr. p. 181.

{¶ 51} During his cross-examination of Smith, defense counsel elicited the following:

Q:   Now, once you're down in the basement, you said you only saw the Defendant, right:   You didn't see anyone else; is that right?

A:   No, I didn't see no one else.

Q:   Okay.   But you said you felt like there could've been a second person?

A:   Yeah.   It could've been somebody else with him.

Q:   Okay.   And why do you think that?

A:   Because I was being, you know, chopped in the head so much.   * * *

Q:   So you were being hit a lot of times?

A:   Yeah, a lot of times.

Q:   And you thought there could've been more than one person doing it?

A:   Yeah, I thought it could've been more than one.

Q:   Okay.   But you did see the Defendant down in the basement, right? [Portis]?

A:   Oh, yes.

Tr. p. 184-185.

{¶ 52} The testimony elicited from Smith indicated the following: (1) he observed Portis turn off the string light in the basement just seconds before the attack commenced; (2) he was not able to confirm that Portis was the person who was hitting him; (3) he was being hit so many times he thought there might be a second person involved in the attack; but (4) he did not observe a second person.

{¶ 53} In our view, Smith's testimony allowed for the possibility that a second person was involved in the attack. Thus, we cannot say the trial court abused its discretion in instructing the jury on complicity.

{¶ 54} The second assignment of error is overruled.

## IV. Prosecutorial Misconduct

{¶ 55} The third assignment of error states as follows:

THE RECORD DEMONSTRATES PROSECUTORIAL MISCONDUCT OCCURRED DURING THE TRIAL.

{¶ 56} Portis asserts the prosecutor acted improperly during trial. Specifically, he claims the prosecutor improperly changed the theory of the case and requested a jury instruction on complicity. He further claims the prosecutor asked leading questions in order to establish the identity of the assailant. Finally, Portis faults the prosecutor for "having Portis acknowledge the existence of a warrant [to] justify [sic] an illegal stop, arguing that [Portis's] absence and flight from the police meant he was guilty[.]"

{¶ 57} At the outset, we note Portis did not object to any of the alleged misconduct except for the State's request for the complicity jury instruction. Therefore, he must

demonstrate plain error regarding the remaining alleged errors. *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 109. To constitute plain error, an error must be an obvious defect that would clearly, but for the error, have resulted in a different outcome at trial. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 177, quoting *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶ 58} Given our resolution of Portis's assignment of error regarding the requested complicity instruction, we conclude that he has failed to demonstrate prosecutorial misconduct on this basis.

{¶ 59} We next note that Portis has failed to direct our attention to the portions of the record which demonstrate his claim that the State asked leading questions in order to establish his identity as the assailant. *See* App.R. 16(A)(3). Regardless, we have reviewed the entire trial transcript and cannot discern any improper or leading questions asked by the State concerning Portis's identification as the assailant.

{¶ 60} Next, Portis posits the prosecutor improperly caused him to acknowledge the existence of a prior warrant for his arrest. We find this assertion lacks merit, as this information was elicited during Portis's direct examination by defense counsel in order to suggest that he was fleeing the police because of the warrant, as opposed to the attacks upon Smith and Coleman.

{¶ 61} Finally, Portis contends the prosecutor improperly argued that the jury could infer guilt from the fact that Portis left the scene of the attack and later fled from the police.

{¶ 62} "[I]t has been 'universally conceded that the fact of [an] accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct are admissible as evidence of consciousness of guilt, and thus of guilt

itself.' " *State v. Wood*, 2d Dist. Clark No. 2010-CA-42, 2011-Ohio-2314, ¶ 30 quoting *State v. Stevens*, 2d Dist. Montgomery No. 16509, 1998 WL 151107, *7 (Apr. 3, 1998).

**{¶ 63}** Here, the evidence demonstrated that Portis left the residence immediately after the commission of the offenses, and approximately 12 hours later, he attempted to elude the police.   Although Portis claimed he fled because he had an outstanding warrant and knew he would go to jail on that warrant if he were caught, the jury was free to disregard this testimony and, instead, conclude he fled because of the attack on Smith and Coleman.

**{¶ 64}** From our review of the record, we conclude that Portis has failed to demonstrate prosecutorial misconduct.   Therefore, the third assignment of error is overruled.

## V.    Cumulative Error

**{¶ 65}** Portis's fourth assignment of error states:

PORTIS WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO CUMULATIVE ERROR.

**{¶ 66}** Portis claims he was deprived of a fair trial due to cumulative error.

**{¶ 67}** The Supreme Court of Ohio has recognized that multiple errors, when aggregated, may violate a defendant's right to a fair trial, even when those errors are determined to be harmless when separately considered.   *State v. DeMarco,* 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.   "To find cumulative error, we first must find multiple errors committed at trial, and secondly, we must conclude that a reasonable probability exists that the outcome of the trial would have been different

but for the combination of the harmless errors." *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 61 (2d Dist.), citing *State v. Madrigal*, 87 Ohio St.3d 378, 398, 721 N.E.2d 52 (2000).

{¶ 68} Because we have found no error, we obviously cannot make a finding of cumulative error.

{¶ 69} Portis's fourth assignment of error is overruled.

## VI. Conclusion

{¶ 70} All of Portis's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Johnna M. Shia
Hon. Susan D. Solle