[Cite as *State v. Hatfield*, 2022-Ohio-148.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

STATE OF OHIO                                  :
                                               :
    Plaintiff-Appellee                     :     Appellate Case No. 28990
                                               :
v.                                             :     Trial Court Case No. 2020-CR-1465/2
                                               :
DUSTIN HATFIELD                                :     (Criminal Appeal from
                                               :     Common Pleas Court)
    Defendant-Appellant                    :
                                               :

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of January, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

BEN M. SWIFT, Atty. Reg. No. 0065745, P.O. Box 49637, Dayton, Ohio 45449
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

EPLEY, J.

{¶ 1} Dustin Hatfield was found guilty after a jury trial in the Montgomery County Court of Common Pleas of two counts of murder as a proximate result of felonious assault (serious physical harm and deadly weapon), two counts of felonious assault (serious physical harm and deadly weapon), failure to comply with an order or signal of a police officer, and three counts of tampering with evidence (handgun, cell phone, and pill bottle containing money). The trial court found Hatfield guilty, after a bench trial, of an additional charge of having weapons while under disability. After merging several offenses, Hatfield received an aggregate sentence of 24 years to life in prison and was ordered to pay restitution.

{¶ 2} Hatfield appeals from his convictions, claiming that (1) his convictions for felony murder and failure to comply were based on insufficient evidence and against the manifest weight of the evidence, (2) the trial court abused its discretion in admitting recordings of various phone conversations, (3) the trial court failed to properly instruct the jury, (4) the trial court erred in failing to merge tampering with evidence (handgun) with having weapons while under disability, and (5) the trial court erred in imposing consecutive sentences. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 3} During the morning of March 28, 2020, David Robinson was shot and killed at 207 Elkins Avenue in Trotwood, the home of his friend, DeAngela Ewing. Ewing was not home when the shooting occurred, but two men had come to her residence prior to her leaving. A neighbor heard gunshots, saw an injured Robinson in Ewing's driveway,

observed two men speeding away in a grayish-brown Grand Marquis, and contacted the police. Trotwood police officers broadcasted a description of the vehicle.

{¶ 4} A Miamisburg police officer saw a vehicle that looked similar to the broadcasted description near the Dayton Mall, followed the vehicle, and attempted to initiate a traffic stop. The vehicle did not stop, however, and a high-speed chase ensued along southbound Interstate 75, during which the passenger, later identified as Hatfield, threw cell phones, pieces of a dismantled gun, and a pill bottle containing money out of the passenger-side window. The chase ended when the Grand Marquis, driven by William Denny, crashed near Paul Brown Stadium in Cincinnati. Both men were apprehended immediately after the crash.

{¶ 5} On May 28, 2020, Hatfield was indicted on three counts of tampering with evidence – a handgun, a cell phone, and a pill bottle containing money – and one count of having weapons while under disability based on a prior domestic violence offense. The charge of tampering with the handgun included a firearm specification (the "A" Indictment.) One month later, a grand jury indicted Hatfield on nine additional counts: murder as a proximate result of felonious assault (serious physical harm); felonious assault (serious physical harm); murder as a proximate result of felonious assault (deadly weapon); felonious assault (deadly weapon); murder as a proximate result of aggravated robbery (serious physical harm); aggravated robbery (serious physical harm); murder as a proximate result of aggravated robbery (deadly weapon); aggravated robbery (deadly weapon); and failure to comply with order/signal of a police officer. Each of the murder, felonious assault, and aggravated robbery counts included a firearm specification (the "B" Indictment.) In September 2020, Hatfield was re-indicted on failure to comply, having

weapons while under disability, and the three charges in the A Indictment (the "C" Indictment.)   The previous indictments for those five charges were dismissed.

{¶ 6} Hatfield raised several evidentiary issues prior to and during the trial.   Of relevance to this appeal, Hatfield challenged the admissibility of several recorded telephone conversations, one of which occurred while the Grand Marquis sped down Interstate 75 following the shooting and two of which occurred while Hatfield was incarcerated at the Hamilton County Jail.   Hatfield also questioned whether the State's digital forensic examiner was required to provide an expert report.

{¶ 7} In September 2020, the matter proceeded to a jury trial on all counts and specifications, except having weapons while under disability, which was tried to the bench.   After deliberations, the jury reached the following verdicts:

| Count | Offense | Verdict |
|-------|---------|---------|
| 1 | Murder - proximate result of felonious assault (serious physical harm) | **Guilty** |
| 1 | Firearm Specification | Did not have |
| 2 | Felonious Assault (serious physical harm) | **Guilty** |
| 2 | Firearm Specification | Did not have |
| 3 | Murder - proximate result of felonious assault (deadly weapon) | **Guilty** |
| 3 | Firearm Specification | Did not have |
| 4 | Felonious Assault (deadly weapon) | **Guilty** |
| 4 | Firearm Specification | Did not have |
| 5 | Murder - proximate result of aggravated robbery (serious physical harm) | Not Guilty |
| 5 | Firearm Specification | N/A |
| 6 | Aggravated Robbery (serious physical harm) | Not Guilty |
| 6 | Firearm Specification | N/A |
| 7 | Murder - proximate result of aggravated robbery (deadly weapon) | Not Guilty |

| | | |
|---|---|---|
| | Firearm Specification | N/A |
| 8 | Aggravated robbery (deadly weapon) | Not Guilty |
| | Firearm Specification | N/A |
| 9 | Failure to Comply with Order/Signal of Police Officer | **Guilty** |
| | Firearm Specification | **Had Firearm** |
| 10 | Tampering with Evidence: handgun | **Guilty** |
| | Firearm Specification | **Had Firearm** |
| 11 | Tampering with Evidence: cell phone | **Guilty** |
| 12 | Tampering with Evidence: pill bottle containing money | **Guilty** |

The trial court vacated the jury's verdict on the firearm specification for failure to comply because the indictment had not included a firearm specification for that offense, and therefore the specification had not been properly submitted to the jury. The trial court separately found Hatfield guilty of having weapons while under disability.

{¶ 8} Both parties submitted sentencing memoranda. They agreed that the murder and felonious assault charges merged for sentencing. The State recommended maximum and consecutive sentences for the remaining charges. Hatfield argued that the three tampering with evidence offenses should merge with each other, noting that the re-indicted charges included the phrase "as part of a continuing course of conduct." He further argued that having weapons while under disability should merge with tampering with the firearm. Hatfield requested concurrent sentences.

{¶ 9} At sentencing, the trial court imposed the following sentences:

| Count | Offense | Sentence | Consecutive/Concurrent |
|---|---|---|---|
| 1 | Murder | 15 years to life | |

| 9 | Failure to Comply | 3 years | Consecutive to Count 1 |
|---|---|---|---|
| 10 | Tampering with Evidence: handgun | 3 years | Consecutive to Counts 1 & 9 |
| | Firearm Specification | 1 years | Consecutive and prior to definite term |
| 11 | Tampering with Evidence: cell phone | 3 years | Concurrent with Counts 1 & 10 |
| 12 | Tampering with Evidence: pill bottle with money | 3 years | Concurrent with Counts 1 & 10 |
| 13 | Having Weapons while under Disability | 2 years | Consecutive to Counts 1 & 10 |

Hatfield's aggregate sentence was 24 years to life in prison. He also was ordered to pay restitution to Katrina Robinson in the amount of $1,086.85.

{¶ 10} Hatfield appeals from his convictions, raising five assignments of error.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 11} In his first assignment of error, Hatfield claims that his convictions for murder as a proximate result of felonious assault and failure to comply with an order or signal of a police officer were based on insufficient evidence and against the manifest weight of the evidence. Hatfield does not challenge his convictions for tampering with evidence or having weapons while under disability.

### A. Standards of Review

{¶ 12} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential

elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 13} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 14} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 15} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *Thompkins* at 386.

However, where an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient evidence. *State v. McLoughlin*, 2d Dist. Champaign No. 2017-CA-22, 2018-Ohio-2426, ¶ 8; *State v. Million*, 2d Dist. Montgomery No. 24744, 2012-Ohio-1774, ¶ 23.

**B. The Evidence at Trial**

{¶ 16} At trial, the State presented 22 witnesses and 185 exhibits; Hatfield did not offer any evidence in his defense. The parties submitted four joint exhibits: recordings of six phone calls made by Hatfield from jail and a timetable for when these calls occurred. The evidence at trial established the following facts.

*1. Robinson Visits with Ewing*

{¶ 17} DeAngela Ewing and David Robinson knew each other since they were teenagers (Ewing was 44 years old at trial), but had seen each other only a handful of times in the past decade. About a month before the shooting, Robinson dropped by Ewing's home and helped her lay carpet in her son's bedroom. At around noon on March 27, 2020, Robinson returned to Ewing's home because he had left a "carpet kicker" tool at her house.

{¶ 18} Robinson spent the rest of the day with Ewing, and Ewing noticed that Robinson had money in his front pocket and a bank envelope with additional money in another pocket; it "looked like a lot" of money to her.

{¶ 19} At roughly 4:00 p.m. that afternoon, Ewing permitted Robinson to meet someone in her garage regarding a drug transaction. Robinson was a recovered heroin user, but he bought drugs to sell. Ewing did not pay attention to the people Robinson met, and Ewing surmised that about 10 people went into the garage during the day, as it

was not unusual for people to be in and out of her garage. After Robinson and Ewing took Ewing's children to her mother's home, the two went to a pizza parlor in Moraine and other places together.

**{¶ 20}** Robinson and Ewing returned to Ewing's home between 3:00 and 4:00 a.m. on March 28. Ewing's sister, Christina, and Christina's friend, L.R., were at her house when they arrived. For an hour or so, the four sat at a table, drinking and looking at Robinson's coin collection. Robinson then went upstairs. Ewing remained downstairs and began to clean her home. She stated that she was drunk, on new medication, and feeling "buzzed," lightheaded, and "a little fruity."

**{¶ 21}** According to the motion-activated surveillance cameras at the home of Deveonna Myers, who lived across the street from Ewing, a black Lexus SUV and a silver SUV were parked at Ewing's home at 7:30 a.m. The black SUV was later determined to belong to Robinson, and Myers was familiar with a silver SUV being at Ewing's home. Photographs and video footage of the scene showed that a minivan and a pick-up truck also were parked in the driveway, closer to the home and garage; these vehicles seemed to be inoperable and used only for storage of junk. *See* Tr. at 446.

*2. William Denny and Dustin Hatfield Come to Ewing's Home*

**{¶ 22}** Sometime between 7:30 a.m. and 8:48 a.m., two men in cowboy hats arrived at Ewing's home in a grayish-brown Mercury Grand Marquis, which Ewing described as a "grandma-looking car." (Surveillance video showed that the vehicle was not present at 7:30 a.m., but was present at 8:48 a.m.) Ewing was outside when the men arrived. She described the driver as older than the passenger, and she noticed that the passenger had tattoos and was attractive. The passenger asked if a person (not

Robinson) was there. Ewing responded that she, Robinson, her sister, and L.R. were the only ones present. When Ewing told the men that she was preparing to leave for the grocery store, the passenger said that he had left something in the garage the previous day. Ewing granted them permission to go into the garage to look for it.

{¶ 23} The men stayed "a long time," and Ewing checked on them periodically. She testified that she spoke with them three different times. Ewing noticed that the driver had a chrome- or silver-colored "big gun" in the back of his pants.

{¶ 24} At 9:38 a.m., the silver SUV left Ewing's residence, returned at 9:44 a.m., and left again 12 minutes later, at 9:56 a.m. State's Ex. 160. There was no testimony about whether Christina and L.R. left in the silver SUV, but they were not present when the police later arrived. The Grand Marquis was still at Ewing's home.

{¶ 25} At some point, Ewing left for the grocery store, first walking to her friend's home through the trees behind her house. She left a note for Robinson, who was asleep upstairs, saying, "Dave. I went to get some food. Grocery's. Don't go no where." State's Ex. 163. Ewing tried to hint to the men to leave, but they did not. When Ewing left, she saw the men walking toward her door. Ewing testified that the door was unlocked.

{¶ 26} At 10:00 a.m., Edwin Scott, who lived next door to Myers and across from Ewing, heard gunshots, went to his bedroom window, and saw a vehicle speeding off. When he went outside, Scott saw Robinson "laying down on his knees" in Ewing's driveway. Robinson then fell "straight back." Scott called 911 to report the shooting. He told the dispatcher that a man appeared to have been shot in his stomach and that two men "peeled off" in a brownish-gray Crown Victoria toward Third Street. Scott

reported that the rear driver's side window of the vehicle was covered by a blue bag. Tire marks showed that a vehicle accelerated rapidly from the scene.

{¶ 27} Robinson died from a single gunshot wound to his torso. Stippling showed that the gun was fired between 6 to 8 and 24 inches from Robinson's body, with the distance likely closer to two feet away. The coroner testified that Robinson probably would have been unconscious after 10 to 15 seconds, and that death would have occurred in four to six minutes.

3. *High-Speed Chase and Evidence on Interstate 75*

{¶ 28} Shortly after 10:00 a.m., Miamisburg Police Officer Steven Davis heard a report about a vehicle that had fled a shooting in Trotwood, and he drove to a lot overlooking State Route 725 and Interstate 75. Officer Davis testified that, due to restrictions for the Covid-19 pandemic, only essential personnel were supposed to be out and there was very little traffic; his cruiser video substantiated that traffic was light.

{¶ 29} Davis soon observed a vehicle that reasonably matched the reported description exit from southbound Interstate 75 onto westbound State Route 725. The officer followed the vehicle, noticing that the route did not make sense. After running the vehicle's plates and observing traffic violations, Officer Davis activated his overhead lights to initiate a traffic stop. The Grand Marquis accelerated, re-entered southbound Interstate 75 from eastbound State Route 725, and sped down the interstate at speeds exceeding 100 mph. The Grand Marquis took the Austin Boulevard exit, crossed Austin Boulevard, and again re-entered southbound Interstate 75. The vehicle continued down Interstate 75 at speeds over 100 mph, at times weaving between lanes and driving on the shoulder.

{¶ 30} Several Ohio State Highway Patrol troopers joined the chase, including Trooper Todd Bailey and Sergeant Christina Hayes. At times, Denny brake-checked when Trooper Bailey's vehicle was directly behind him, causing Bailey to swerve. Stop sticks were deployed in an attempt to stop Denny's vehicle. Denny continued driving despite the deflation of three tires, and he ultimately crashed his vehicle at 10:56 a.m. at Exit 1A in Cincinnati near Paul Brown Stadium.

{¶ 31} Hatfield stipulated that he was the passenger in the Grand Marquis while it sped toward Cincinnati. When Denny and Hatfield were near Exit 29, Hatfield received a phone call from his wife, Courtney Jackson, on Denny's phone. Courtney recorded four and a half minutes of the conversation on her iPhone. State's Ex. 177-C, 179A. During the call, Hatfield told her that he was getting ready to throw a pill bottle out of the window, and said that he was "about to give [her] $3,000 and go to jail." Hatfield threw the money out of the car at the Hamilton and Liberty Way exit and instructed Courtney to retrieve the money without delay. During the conversation, Hatfield also could be heard directing Denny on how to drive and where to go. Cell phone location data showed that Denny's phone was traveling southbound on Interstate 75 after the shooting. State's Ex. 186.

{¶ 32} During the pursuit, troopers observed Hatfield's hands out of the passenger-side window. Trooper Sidney Steele later found the bottom piece of a Glock handgun at Mile 40. A pill bottle with $1,643 in cash was found on the right shoulder near Mile 26; examination by Miami Valley Regional Crime Lab (MVRCL) personnel revealed that latent prints on a $1 bill matched Hatfield's left palm print and left middle finger, and that a blood stain on the bill matched Denny's DNA. Trooper Bailey saw a cell phone, later

determined to be Denny's, being thrown out of the passenger-side window at Mile 3.4; that phone also was recovered by law enforcement. A recoil spring for a semiautomatic pistol was located during a later search of Denny's vehicle.

{¶ 33} On April 2, the Trotwood police put together a team to search Interstate 75 between State Routes 725 and 73 for additional evidence. A Samsung cell phone was found along Interstate 75, just north of the Austin Boulevard exit; no data from March 27-28 was found on this device. A gun slide and a gun barrel of a Glock 9mm were located on the Austin Boulevard on-ramp to southbound Interstate 75; the slide and the barrel had the same serial number: BBRZ985. Tr. 683-684. A 9mm Hornady bullet also was located during the search.

*4. Trotwood Investigation*

{¶ 34} While officers and troopers pursued the Grand Marquis, Trotwood police officers investigated the shooting at Ewing's residence. Officer Roger Hoff was assigned to process the scene as an evidence technician. Although the residence was cluttered, he noticed evidence of a struggle in the upstairs master bedroom and at the base of the stairs. In the bedroom, he observed a broken picture frame, a heater that had been tipped over, and a pillow with blood. Additional items with blood were located in a crib. Two 9mm Hornady shell casings were found by the bedding. At the base of the stairs, a lamp and some picture frames had been knocked to the ground and they appeared to have blood on them. A third 9mm Hornady shell casing was located on the floor in the living room. Ewing testified that there were no bullets or casings at her home when she left that morning. Outside, officers recovered coins from the porch and found currency in a puddle on the driveway.

{¶ 35} Forensic DNA analyst Kristen Richards tested 29 items, including swabs from the floor of Ewing's house, swabs from the lamp, swabs from a picture frame and glass, swabs from two pillows, swabs from the crib, DNA samples from the Glock, a sample from a $1 bill, and samples from clothing that Denny was wearing on March 28. She compared the items to known samples from Denny, Hatfield, and Robinson. Denny or Robinson was found to be a contributor to most of the various DNA samples. None of the items was matched to Hatfield; he was excluded as a contributor from 27 submissions, and two submissions were unsuitable for comparison.

{¶ 36} On April 1, 2020, Trotwood Detectives Bethany Morrissette and Matt Buddo spoke with Hatfield, at his request, in the Hamilton County Jail. Hatfield answered numerous questions during the 26-minute interview. Hatfield did not provide a written confession or make any admissions about being the shooter, stealing the gun used to shoot Robinson, or possessing the gun at Ewing's residence.

{¶ 37} Courtney's former husband, Larry Jackson, testified that Courtney had received a Glock 9mm handgun and a 380 ACP Glock, as well as carrying cases and magazines for those weapons, when they divorced. On April 23, 2020, Detective Morrissette and other officers executed a search warrant of Hatfield and Courtney's townhouse, searching for firearms and items related to firearms. In the primary bedroom, officers located two gun cases for Glocks, one of which was for a 9mm handgun with serial number BBRZ985 (matching the serial number for the gun parts found on Interstate 75) and the other was for a .380 caliber handgun with serial number AAZE808. The cases indicated that the AAZE808 gun came with two magazines with six rounds and the BBRZ985 gun came with three magazines with 15 rounds. Officers found the .380

gun and two magazines with .380 bullets, as well as two loaded magazines with 9mm bullets. Hornady 9mm bullets and other ammunition also were located in the home.

{¶ 38} While at Hatfield's residence, Detective Morrissette collected a bag of clothes and a pair of shoes that belonged to Denny. Courtney, who was present during the execution of the search warrant, told the detective that Denny had left the items there on March 27.

{¶ 39} Robert Burns, a firearm expert at MVRCL, received the components of a Glock model 19, generation 4, 9mm semiautomatic pistol with serial number BBRZ985. He assembled the frame, recoil spring, slide, and barrel, and he test-fired the weapon. Upon comparing the test-fired cartridge case with the three Hornady casings recovered from Ewing's home, Burns concluded that they had been fired from the same slide. He also compared the test-fired bullet with the bullet retrieved during Robinson's autopsy and concluded that the bullets had been fired from the same barrel.

5. *Jail Phone Calls by Hatfield*

{¶ 40} On April 24, 2020, Hatfield made five phone calls from jail: two to Betty Hatfield at 8:58 a.m. and 9:40 a.m., and three to Larry Jackson at 9:03 a.m., 10:15 a.m., and 12:30 p.m. *See* Joint Ex. 4.

{¶ 41} In the first phone call at 8:58 a.m., Betty told Hatfield that someone said that he was "snitching." Joint Ex. 1; 1587733111_214_12_199_392.wav. The call lasted 5 minutes and 22 seconds, although the recording was an excerpt of the call.

{¶ 42} At 9:03 a.m., almost immediately after the call to Betty concluded, Hatfield called Jackson, asking him if he had talked with Courtney. Jackson responded that he had spoken to her in person and mentioned that Courtney's phone had been taken the

previous day. Hatfield asked Jackson to contact detectives and tell them that he had stolen the gun and "had murdered dude." Hatfield noted that it was now on a recording and "everything I do is for a reason." Jackson said he would pass that along to Courtney. Joint Ex. 3; 1587733435_214_12_ 195_598.wav.

{¶ 43} Hatfield spoke with Betty again at 9:40 a.m.; during the conversation, he told her that he had orally confessed to stealing the gun and shooting Robinson five times, that his confession would be written out, that he would be taken to Montgomery County, and that he would be pleading guilty to murder. When Betty said that Robinson had only been shot once, Hatfield responded that he "knows the truth and so do they." Betty expressed to Hatfield that she hoped "me telling you what I told you is not what provoked you to go do all that." Hatfield replied that it was "okay. It was gonna happen anyway." Joint Ex. 2; 9-30-20 1587735622_214_13_174_4.wav. Joint Exhibit 2 was an excerpt of a 4 minute and 26 second call.

{¶ 44} At 10:15 a.m., Hatfield called Jackson a second time and said that he (Hatfield) had signed a confession for detectives. Jackson told Hatfield that Courtney was getting a SIM card and would be able to take his call shortly, but he would pass the message on to her. Joint Ex. 1; 1587737706_214_12_154_617.wav. Hatfield called Jackson again and said that he had written his confession. Hatfield apologized to Jackson for putting him in the middle, and he expressed that he did not want to "bring no one down with me." Joint Ex. 1; 1587763855_214_12_195_103.wav. The recording was a portion of a 3 minute and 50 second conversation.

{¶ 45} The State did not present any evidence to corroborate Hatfield's recorded oral statements that he made either an oral or written confession to detectives.

{¶ 46} The following day, April 25, Hatfield telephoned Courtney and spoke with her for 20 minutes; the jury heard two portions of the call. During their conversation, Hatfield told Courtney that someone had told him that, if he snitched, they would hunt him down and kill him. He said that he had confessed because of the threat. Hatfield accused Courtney of telling people that he was cooperating and said that "word of mouth was getting around." He told Courtney that he had to "do something yesterday because I was fearing for my life. So I had to make a big show about it." Joint Ex. 1; 1587835798_214_ 12_196_92.wav Parts 1 & 2.

**C. Hatfield's Conviction for Murder (Proximate Result of Felonious Assault)**

{¶ 47} Hatfield was convicted of murder, in violation of R.C. 2903.02(B), which states:

> No person shall cause the death of another as a proximate result of the
> offender's committing or attempting to commit an offense of violence that is
> a felony of the first or second degree and that is not a violation of section
> 2903.03 [voluntary manslaughter] or 2903.04 [involuntary manslaughter] of
> the Revised Code.

Hatfield's felony murder convictions were predicated on two felonious assault offenses (serious physical harm and deadly weapon) against Robinson. The felonious assault statute provides, in relevant part, that "[n]o person shall knowingly do either of the following: (1) Cause serious physical harm to another * * *; [or] (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A).

{¶ 48} Felony murder does not require a specific intent to cause death. *State v.*

*Dixon*, 2d Dist. Montgomery No. 18582, 2002 WL 191582, *5 (Feb. 8, 2002).   Rather, R.C. 2903.02(B) relies on a "proximate cause theory" under which it is irrelevant whether the killer was the defendant (Hatfield), an alleged accomplice (Denny), or a third party, such as a police officer or an intended victim.   *Id.* (addressing felony murder where a store manager killed the defendant's accomplice during the course of an aggravated robbery).   As we stated in *Dixon*,

> Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the "proximate result" of Defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience.

*Id.* at *5.

{¶ 49} With Hatfield's underlying offense of violence being felonious assault, "felony murder is supported by evidence that establishes that the defendant knowingly caused physical harm to the victim."   *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 13, citing *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498.   *See State v. Wynn*, 2d Dist. Montgomery No. 25097, 2014-Ohio-420, ¶ 64 ("The culpability required for the commission of felony murder with a predicate offense of felonious assault is 'knowingly.' ")   "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.   A person has knowledge of circumstances when he is

aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 50} Hatfield was charged as a principal offender, but the State also proceeded under a complicity theory. R.C. 2923.03, the complicity statute, extends criminal liability to those who "aid or abet another in committing the offense" while "acting with the kind of culpability required for the commission of an offense." *See* R.C. 2923.03(A)(2). The complicity statute further provides that "[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F). The State may charge complicity in terms of the complicity statute or in terms of the principal offense (felony murder and felonious assault, in this case). *See State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 181; *State v. Portis*, 2d Dist. Montgomery No. 28677, 2021-Ohio-608, ¶ 48. "Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated * * * in terms of the principal offense' and does not mention complicity." *State v. Herring*, 94 Ohio St.3d 246, 251, 752 N.E.2d 940 (2002).

{¶ 51} "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus; *Wynn* at ¶ 66. "[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *Johnson* at 243, citing *State v. Widner*, 69 Ohio St.2d 267,

269, 431 N.E.2d 1025 (1982). However, "'[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶ 52} In this case, we conclude that the State presented sufficient evidence that Hatfield had committed felony murder as a proximate result of felonious assault, either as the principal offender or as an accomplice. The evidence, construed in the State's favor, established that Denny and Hatfield went together to Ewing's house on Elkins Avenue in search of someone and something. Although neither Ewing nor her neighbor, Scott, was able to identify the men at Ewing's home, the State's presented substantial circumstantial evidence that the men involved in the police chase down Interstate 75, Denny and Hatfield, were the same men who had fled from Elkins Avenue in Trotwood.

{¶ 53} At Ewing's home, Hatfield told Ewing that they had left something in the garage (where drug deals occurred) the previous day and asked for a particular individual. Hatfield and Denny did not find what they were looking for, yet they remained on the property between 75 and 150 minutes. When Ewing was leaving for the grocery store, they were headed together toward the door to the house. They fled together immediately after the shooting.

{¶ 54} Robinson was shot and killed with the gun that Hatfield threw out of the passenger window of the Grand Marquis as the two men raced southbound on Interstate 75. Ballistic testing showed that the gun that was discarded during the police chase fired the shot that killed Robinson. The serial number on the weapon proved that the gun belonged to Hatfield's wife, Courtney, and the case for the gun was found in the

primary bedroom of the couple's townhouse. Although Ewing saw Denny with a gun in the back of his pants, Hatfield admitted in jail phone calls to stealing Courtney's gun, firing five shots, and killing "the dude." The State's evidence, if believed, was sufficient to prove that Hatfield committed felony murder and the underlying felonious assault as the principal offender.

{¶ 55} Hatfield argues that the jury necessarily rejected that he was the principal offender by finding that he did not have a firearm when committing felonious assault and felony murder. Hatfield thus asserts that the State "had to prove that Hatfield was complicit or aided and abetted Denny in committing felonious assault with a deadly weapon and causing Robinson's death." Hatfield claims that the State failed to present sufficient evidence that he knew Denny had a weapon and was planning to shoot Robinson and that he shared Denny's criminal intent.

{¶ 56} As a corollary to Hatfield's complicity argument, Hatfield further claims that the jury's verdicts were inconsistent in that they found Hatfield not guilty of aggravated robbery but guilty of felonious assault. Hatfield acknowledges that inconsistency between verdicts on two different charges is not a basis for reversal, but he emphasizes that the State's theory for both offenses was that he was complicit in the crimes. Hatfield concludes that if he was not complicit in the aggravated robbery and firearm specifications, then the jury should have found the same for the felonious assault charges.

{¶ 57} Hatfield states, "a conviction on one count of an indictment may not be reversed upon the ground that it is inconsistent with an acquittal on another count." *State v. Hayes*, 166 Ohio App.3d 791, 2006-Ohio-2359, 853 N.E.2d 368, ¶ 35 (2d Dist.); *State v. Henderson*, 2d Dist. Montgomery No. 26018, 2014-Ohio-4601, ¶ 18. The fact that

Hatfield was acquitted of aggravated robbery and felony murder as a proximate result of aggravated robbery has no bearing on his conviction for felony murder as a proximate result of felonious assault.

{¶ 58} Moreover, although the jury found Hatfield not guilty of the firearm specifications attached to the charges of felonious assault and felony murder as a proximate result of felonious assault, that finding does not require that we focus on complicity as the basis for Hatfield's felony murder conviction, nor does it render Hatfield's conviction against the manifest weight of the evidence.

{¶ 59} "It is well-established by courts in Ohio that 'a finding of guilty on a principal charge but not guilty on a specification attached to the charge does not render the verdict inconsistent and thus invalidate the guilty verdict on the principal charge, at least where legally sufficient evidence supports the guilty verdict on the principal charge.' " *State v. Ortega*, 2d Dist. Montgomery No. 22056, 2008-Ohio-1164, ¶ 17, quoting *State v. Gardner*, 2d Dist. Montgomery No. 21027, 2006-Ohio-1130, ¶ 32.   For example, we have held that a conviction for aggravated robbery (deadly weapon) was not against the manifest weight of the evidence, even though the jury acquitted the defendant of the firearm specification attached to that charge.   *State v. Smith*, 2d Dist. Montgomery No. 26116, 2015-Ohio-1328, ¶ 17.   We commented, "Although we do not know why the jury acquitted Smith on the firearm specification, doing so did not render his aggravated robbery conviction against the weight of the evidence."   *Id*.

{¶ 60} Irrespective, we find that the State presented sufficient evidence to support a conclusion that Hatfield was complicit in the felonious assault and murder of Robinson. Denny and Hatfield came together to Ewing's residence, and Hatfield told Ewing that he

had left something there the previous day. They also asked Ewing if someone (not Robinson) was there; Ewing responded that she, her sister, L.R., and Robinson were the only ones there. Hatfield and Denny remained at Ewing's property for one to two hours. Although they had asked about an unknown individual, they approached the house together when Robinson was the only person remaining inside. At this time, Denny possessed a gun that belonged to Hatfield's wife, which apparently had been kept in Hatfield's bedroom. A portion of the gun was visible to Ewing.

{¶ 61} Denny and Robinson had a physical altercation inside Ewing's home; blood and overturned or broken objects reasonably suggest that there was fight in the upstairs master bedroom. Two shots were fired in the upstairs bedroom and an additional shot was fired in the living room. There is no evidence that Hatfield went inside Ewing's home and directly participated in the altercation, but Denny and Hatfield sped away from the scene together. While the two headed southbound in the car, the gun was dismantled and pieces were thrown from the vehicle by Hatfield.

{¶ 62} We conclude that the evidence, construed in the State's favor, supported a conclusion that Hatfield was complicit in the felonious assault of Robinson, which proximately caused Robinson's death. The jury could have reasonably concluded that Hatfield and Denny acted together in searching for an item in Ewing's garage, that they waited for Robinson to be alone, and that Hatfield supported Denny's confrontation with Robinson when they approached the door to Ewing's home. Even assuming that Denny fired the Glock, the State's evidence supported a conclusion that Hatfield either stole and provided Courtney's gun to Denny or at least knew that Denny possessed her gun. The fact that no physical evidence placed Hatfield inside the home during the assault did not

require a conclusion that he was merely present and uninvolved. Moreover, Hatfield's actions in dismantling the murder weapon and throwing it from the vehicle reasonably further reflected his cooperation with Denny in the assault and murder.

{¶ 63} We recognize that, based on the evidence at trial, the jury could have reasonably concluded that Hatfield neither shot Robinson nor was complicit in Denny's assault of Robinson. Based on Hatfield's conversation with Courtney on April 25, during which he expressed that he falsely made incriminating statements out of fear for his life, the jury could have reasonably concluded (and perhaps did, given its verdicts on the firearm specifications) that Hatfield was not the shooter and did not steal Courtney's gun. The gun used in the murder belonged to Hatfield's wife, and the case for the gun was in their bedroom, but there was evidence that Denny had stayed in the couple's home on March 27, the day before the murder. The jury could have concluded from that evidence that Denny had taken Courtney's gun without Hatfield's knowledge and that Hatfield did not necessarily know that the gun Denny possessed belonged to Courtney. No one testified about Denny's or Hatfield's plans prior to their arrival at Ewing's residence, nor did anyone witness what occurred inside her home.

{¶ 64} It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State proved, beyond a reasonable doubt, that Hatfield had committed the charged offenses. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2d Dist. Montgomery No. 29061, 2021-Ohio-3947, ¶ 27. Although there was evidence from which the jury could have reached a different verdict on the felonious assault and felony murder as a proximate result of felonious assault charges, we cannot conclude that the

jury lost its way when it found Hatfield guilty of those offenses. Hatfield's conviction for felony murder was not against the manifest weight of the evidence.

### D. Hatfield's Conviction for Failure to Comply

{¶ 65} Hatfield further claims that the State failed to prove beyond a reasonable doubt that he was complicit in Denny's failure to comply with an order or signal of a police officer, in violation of R.C. 2921.331(B) and R.C. 2921.331(C)(5).

{¶ 66} R.C. 2921.331(B), the failure to comply statute, provides: "No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." The indictment further alleged that the operation of the vehicle "caused a substantial risk of serious physical harm to persons or property," which elevated the offense to a felony of the third degree. R.C. 2921.331(C)(5)(a)(ii). At trial, defense counsel requested that the jury be instructed that it must find that Hatfield had aided and abetted another in committing the offense. Tr. 842-843. The court agreed that there was no evidence that he acted as the principal offender and provided the instruction as defense counsel requested. Tr. at 843.

{¶ 67} In his appellate brief, Hatfield emphasizes that he was Denny's passenger, had no control over the vehicle, and "could not force Denny to obey the officers, nor did he create the substantial risk at hand." He construes the evidence as follows:

> * * * Hatfield was afraid for his life. During the chase, Hatfield called his ex-wife from Denny's phone and let her know what had happened, not that he did it. Hatfield was obviously scared that he would go to jail because of what Denny did because he was in the car with him. Hatfield told her that

he was throwing money out the window in a pill bottle for her, that he was going to jail, and where to retrieve the money. Then the conversation cut off after Hatfield yelled, "Oh shit!" Hatfield simply gave her money to bail him out of jail. No confessions were made, nor did Hatfield participate or incite Denny to escape from the police.

(Citations omitted.) Appellant's Brief at 15.

{¶ 68} In support of his argument, Hatfield cites to State's Exhibits 177C, 179A, and 152. Exhibit 177C is the recorded conversation between Hatfield and Courtney while the Grand Marquis was driving southbound on Interstate 75; Exhibit 179A is a redacted version of that recording; and Exhibit 152 is video recording from Officer Michael Richardson's cruiser camera. Officer Richardson responded to Ewing's residence, and his cruiser camera video does not show what occurred during the chase. We note, however, that the State presented cruiser videos from Officer Steven Davis (State's Ex. 153), Trooper Bailey (State's Ex.154), and Sergeant Hayes (State's Ex. 155), each of which included footage of the police chase down Interstate 75.

{¶ 69} The State presented evidence that Denny failed to stop when Officer Davis attempted to initiate a traffic stop and, instead, accelerated and fled southbound on Interstate 75 at speeds above 100 mph. Video footage from multiple cruisers showed Denny brake-checking, driving on the shoulder, and weaving between lanes. Despite the deflation and loss of tires and being chased by multiple law enforcements officers with their overhead lights activated, Denny did not stop until he crashed in Cincinnati on Exit 1A.

{¶ 70} The recording of Hatfield's conversation with Courtney during the pursuit

supported a conclusion that Hatfield was complicit in Denny's actions. Hatfield sounded calm when he told Courtney that he was driving by Monroe Corporate Landing by Exit 29 and that he was about to throw a pill bottle containing money out the window. When Courtney asked Hatfield what he was doing, he responded, "I'm about to give you $3,000 and go to jail. [Hatfield laughs.]" Hatfield became animated after Courtney said she did not know where she was going and questioned his statement that he was headed toward Toledo. Hatfield yelled at her about where he was and that she needed to get the money. He acknowledged that "they're still chasing us." Ex. 179-A at 2:09.

{¶ 71} In the middle of the conversation, Hatfield appeared to turn his attention to Denny. Hatfield could be heard saying, as they were nearing Monroe, "* * * Start taking this. * * * Yeah, make them take that one. Others are fearing their life and then it'll cause panic * * * then they set up a road block up here, alright? You might be good." Ex. 179-A at 2:19-2:31. These statements occurred near the time that state troopers first attempted to employ stop sticks. Soon after, Hatfield instructed Denny "to head over here so they don't, you know what I mean, so they throw another roads block stick, whatever * * *." *Id.* at 2:52-2:59.

{¶ 72} Hatfield then told Courtney that he was rolling down the window and throwing out the pill bottle at Exit 24 (Hamilton/ Liberty Way). Afterwards, Hatfield said, "Just ride it out. Get over here so I can dump this, so I can dump this, so I can dump this, so I can dump this, so I can dump this. No, go this way, this way, this way, this way. You're good, you're good, you're good, you're good, you're good. Oh! I just dumped it. * * * They just hit our tires. I've got to go." *Id.* at 3:13-3:31.

{¶ 73} The State thus presented evidence that Hatfield was not a mere passenger

in Denny's vehicle, who was afraid because of what Denny had done. Rather, the evidence supported the conclusion that Denny had failed to comply with law enforcement officers' orders to stop and drove in a matter that caused a substantial risk of serious physical harm to persons or property. Further, the evidence showed that Hatfield had actively assisted Denny in his efforts to elude the police. Hatfield's conviction for failure to comply with an order or signal of a police officer, as an aider and abettor, was based on sufficient evidence and was not against the manifest weight to the evidence.

{¶ 74} Hatfield's first assignment of error is overruled.

### III. Admission of Recorded Conversations

{¶ 75} In his second assignment of error, Hatfield challenges the admissibility of the recorded conversation between Courtney and him during the police chase and the recordings of his phone conversations from the jail.

{¶ 76} The admission or exclusion of relevant evidence is within the sound discretion of the trial court and we review that decision for abuse of discretion. *State v. Jali*, 2d Dist. Montgomery No. 28294, 2020-Ohio-208, ¶ 39. The term "abuse of discretion" indicates an attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). It has been previously noted that most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id*.

### A. Phone Call During Police Chase (Ex. 179-A)

{¶ 77} The recording of the conversation between Hatfield and Courtney while Hatfield was traveling down Interstate 75 was retrieved from Courtney's iPhone. The police obtained Courtney's phone when they executed a search warrant of the couple's home on April 23, 2020. Courtney's phone (along with four other devices) was provided to Jim Swauger, a digital forensic examiner with Binary Intelligence, who was able to download the data from her phone. The data included a phone call on March 28, 2020 that lasted approximately four and half minutes.

{¶ 78} Hatfield contends that the recorded call was not properly authenticated and that the recording was missing several minutes. He also claims that the trial court should not have allowed Swauger's testimony regarding his retrieval of the phone call from Courtney's phone.

*1. Length of Recording*

{¶ 79} Hatfield argues that the recorded telephone conversation should not have been admitted based on the rule of completeness, now codified in Evid.R. 106.

{¶ 80} Evid.R. 106 provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which is otherwise admissible and which ought in fairness to be considered contemporaneously with it." We have stated that Evid.R. 106 "is merely a rule that concerns the timing of evidence that is otherwise admissible." *State v. Matthews*, 2d Dist. Montgomery No. 24233, 2011-Ohio-5066, ¶ 32. When a party has presented a part of a document or recording, an adverse party may present any other document or part thereof to prevent misunderstanding or distortion. *Id.*

{¶ 81} At trial, defense counsel objected to the admissibility of the recording on the ground that the phone conversation between Courtney and Hatfield was 8 minutes and 22 seconds long, whereas the recorded conversation was approximately 4 and a half minutes long. Tr. at 609. After taking time to examine the issue, the prosecutor responded that phone records showed that an eight-minute-long phone call occurred, but only four and half minutes of the call was recorded. Swauger later testified that the iPhone he received contained an audio recording of a phone conversation on March 28, which was created at 10:35:45 a.m. and was last modified at 10:40:12 a.m. He stated that the length of the recording was four and a half minutes. *See* Ex. 177-C.

{¶ 82} On the record before us, there is no indication that the recording of the phone call at issue between Hatfield and Courtney was longer than four minutes and 26 seconds, that any portion of the recording was missing, and/or that the State failed to provide a complete recording to Hatfield. Hatfield has not identified any additional recordings of that phone conversation. Accordingly, Hatfield has not established that the trial court erred in permitting the admission of the recorded phone call under the rule of completeness.

*2. Authentication*

{¶ 83} Hatfield also claims that the recorded conversation between Hatfield and Courtney as Hatfield traveled down Interstate 75 was not properly authenticated.

{¶ 84} Authentication is governed by Evid.R. 901. "Evid.R. 901(A) requires, as a condition precedent to the admissibility of evidence, a showing that the matter in question is what it purports to be." *State v. Simmons*, 2d Dist. Montgomery No. 24009, 2011-Ohio-2068, ¶ 12. "The threshold standard for authenticating evidence is low, meaning

that the party seeking to introduce the disputed evidence need only demonstrate 'a reasonable likelihood that the evidence is authentic.' " (Citations omitted.) *State v. Shropshire*, 2d Dist. Montgomery No. 28659, 2020-Ohio-6853, ¶ 11. Evid.R. 901(B) provides examples of several ways that the authentication requirement may be satisfied. The most commonly used method is oral testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1). *E.g., State v. Quarles*, 2015-Ohio-3050, 35 N.E.3d 616, ¶ 34 (2d Dist.); *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 30.

**{¶ 85}** Here, the recorded conversation was purported to be a conversation between Hatfield and his wife as he and Denny were traveling southbound on Interstate 75 after the murder. Swauger's testimony provided the date and time that the recording was made. He testified that the recording on State's Exhibit 177-C (the CD of the unredacted recording) "matches the recording that I recovered and included in the flash drive report." Cruiser video, cell phone location data, and Hatfield's stipulation placed him in the fleeing Grand Marquis.

**{¶ 86}** Larry Jackson, Courtney's ex-husband, testified that he was married to Courtney for nine or ten years and they have children together. Jackson was familiar with Hatfield, and prior to the Covid pandemic, he would see Hatfield two or three times per week. Jackson knew Hatfield on sight and recognized his voice. During trial, the prosecutor asked Jackson if, before trial, he had listened to a recording of a phone call with which he was not involved. Jackson responded affirmatively and said that he recognized the voices to be those of Hatfield and Courtney. Tr. at 757. When the State played the beginning of Exhibit 179 for Jackson, Jackson testified that he recognized the male voice to be Hatfield's and that the female voice belonged to his ex-wife, Courtney.

Tr. at 762. The State's evidence was sufficient to demonstrate that the audio recording was what it was purported to be.

### 3. Relevance

{¶ 87} Finally, Hatfield claims that the phone conversation between Hatfield and Courtney was more prejudicial than probative and should have been excluded. He argues that his statements were not actually confessions and thus not what the State purported them to be.

{¶ 88} Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402; *State v. Dewberry*, 2d Dist. Montgomery No. 27434, 2020-Ohio-691, ¶ 101. To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Evid.R. 401. In other words, there must be some probative value to the evidence.

{¶ 89} A trial court may still exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403. "Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to the litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001). If the evidence arouses the emotions or sympathies of the jury, evokes a sense of horror, or appeals to an instinct to punish, the evidence is likely unfairly prejudicial and should be excluded. *Id.*

{¶ 90} "[W]hen determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent." *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 22. Courts have characterized Evid.R. 403 as an "extraordinary remedy" which should only be used "sparingly because it permits the exclusion of otherwise relevant evidence." *State v. Sutherland*, 2021-Ohio-2433, 173 N.E.3d 942, ¶ 29 (2d Dist.), quoting *United States v. Meester*, 762 F.2d 867, 875 (11th Cir.1985). The major function of Evid.R. 403 is "limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.*, quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.1979).

{¶ 91} The State adequately authenticated State's Exhibit 179-A. It established that the exhibit was a phone call between Hatfield and Courtney at approximately 10:35 a.m. on March 28, 2020, which was while Hatfield was traveling southbound on Interstate 75 with Denny. The content of the call was relevant to the charges before the jury in that Hatfield discussed his throwing a pill bottle containing money out of the window and made statements related to their attempts to elude the police. The call also substantiated Hatfield's presence in the vehicle and assisted in establishing the link between the fleeing Grand Marquis and the shooting in Trotwood. While Hatfield's statements during the phone call were prejudicial to him, just like most evidence presented by the State in a criminal trial, they were not unduly prejudicial.

**B. Jail Phone Calls**

{¶ 92} Hatfield argues that the court erred in admitting the recorded jail phone calls. He claims that the trial court should not have permitted the State to present the

recordings as admissions and that the statements were misleading, given that Hatfield's statements during those calls were inconsistent with the State's evidence.

{¶ 93} Prior to trial, the parties raised the admissibility of six recorded phone calls made by Hatfield at the Hamilton County Jail. Two of the recordings initially were offered by the State: Hatfield's first call to Jackson and his second call to Betty. The State claimed that the two recordings were admissible as admissions. The other four recordings – the first phone call to Betty, the second and third calls to Jackson, and the call to Courtney – initially were offered by Hatfield. Hatfield asserted that his recordings were not being offered for the truth of the matter and that they should be allowed under the rule of completeness. The parties presented much of their arguments regarding the recordings' admissibility to the trial court via email. *See* Court's Ex. 1.

{¶ 94} Before the start of the trial on Monday, September 28, 2020, the court ruled that all the recordings would be allowed. The court indicated that it was making a liminal ruling, and any objection should be renewed before the call was played. Tr. at 92-93. The parties indicated that they were working together on which portions of the calls would be played. The prosecutor stated that authentication might be addressed by stipulation.

{¶ 95} The following morning, the parties and the court had a short discussion about the preparation of the jail call exhibits. The prosecutor again indicated that authentication would be done by stipulation. Before trial resumed on the morning of Wednesday, September 30, defense counsel told the court and prosecutor that his exhibit with the fourth jail call was ready for the prosecutor to review.

{¶ 96} The six recordings were presented as joint exhibits. The parties stipulated that the recordings were "recorded calls made by Dustin Hatfield by the Hamilton County

Jail" and that "[t]hese recordings have been redacted by agreement of the State of Ohio and the Defense to comply with the Rules of Evidence." Tr. at 812.

{¶ 97} The State argues on appeal that Hatfield failed to preserve his objection to the State's two jail phone calls, because he failed to raise an objection during the trial. We agree.

{¶ 98} A trial court's decision on a motion in limine is an interlocutory and preliminary order on the admissibility of evidence. *State v. Grubb*, 28 Ohio St.3d 199, 200-201, 503 N.E.2d 142 (1986); *State v. Tyra*, 2d Dist. Montgomery No. 27040, 2017-Ohio-313, ¶ 28. To preserve a liminal ruling for appeal, the parties must renew their motions or objections at the appropriate time during trial. *Id.* Hatfield failed to object to the admission of the two recorded calls from the Hamilton County Jail that the State initially offered, and those calls were admitted as a joint exhibit. Consequently, Hatfield has waived his challenge to the admissibility of those calls. *See State v. Baker*, 170 Ohio App.3d 331, 2006-Ohio-7085, 867 N.E.2d 426, ¶ 9 (2d Dist.).

{¶ 99} In the absence of an objection, we review the trial court's ruling for plain error. *Tyra* at ¶ 29. To constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error arises only when "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 100} We find no error, plain or otherwise. "Certain statements are excluded from the definition of hearsay, including statements of a party-opponent where the statement is offered against that party." Evid.R. 801(D)(2)(a); *State v. Cole*, 2d Dist. Miami No. 2013-CA-18, 2014-Ohio-233, ¶ 36. The State's two recorded jail phone calls involved statements by Hatfield in which he admitted to stealing the gun and committing the murder. Such statements squarely fell within Evid.R. 801(D)(2). The fact that Hatfield had other evidence that challenged the veracity of his incriminating statements went to the weight, not the admissibility, of his statements. In this case, the trial court permitted Hatfield to present the recordings of four additional jail phone calls, which, according to Hatfield, showed that he had falsely confessed to avoid being labeled a snitch.

{¶ 101} Hatfield further contends that the State's jail calls did not contain actual confessions, were thus unduly prejudicial, and should have been excluded under Evid.R. 403. But the parties stipulated that the recorded calls in Joint Exhibits 1, 2 and 3 were recorded calls made by Hatfield from the Hamilton County Jail. This stipulation was sufficient to authenticate the phone calls without the presentation of witnesses.

{¶ 102} As with the phone call between Hatfield and Courtney on March 28, 2020, Hatfield focuses on the content of the State's jail phone calls. Joint Exs. 2 and 3. During the calls, Hatfield made incriminating statements, including that he stole the gun and committed the shooting. By their nature, the statements were both highly prejudicial and probative of whether Hatfield had committed the charged offenses. Although Hatfield presented evidence through other jail phone calls that the apparent confessions were not credible, their admission was not unduly prejudicial and thereby subject to exclusion.

Rather, the weight to be given to the statements was a matter for the jury.

### C. Testimony of Digital Forensic Examiner

{¶ 103} Hatfield also appears to challenge the trial court's admission of Swauger's testimony regarding his extraction of cell phone data as lay-witness testimony. In particular, Hatfield notes that he objected to "the admission of phone dumps from Denny's phone" and to Swauger's testimony concerning the download process he used, emphasizing that Denny's phone was damaged and had to be reconstructed. Additionally, Hatfield raises the State's failure to provide a timely expert report.

{¶ 104} At the final pretrial conference, which was held on the Friday before the Monday, September 28 trial date, defense counsel demurred that the State had provided a curriculum vitae for Swauger only the day before. Counsel acknowledged that he had "long ago" received the data that Swauger retrieved, but argued that he had not received any information about the process Swauger used. In response, the State's position was that Swauger was not being offered as an expert witness and that all information had been provided to defense counsel. The trial court ruled that it would allow voir dire of Swauger prior to his testimony and that it would then determine whether Swauger's testimony involved expert or lay testimony.

{¶ 105} Swauger was the first witness on Wednesday, September 30, 2020. After more discussion between the court and parties about the issue, defense counsel questioned Swauger outside the presence of the jury regarding his extraction of data from cell phones. Swauger indicated that two phones that he had received were damaged and first had to be repaired. He clarified that the damage was minor and only screens were broken; the phones were not damaged internally and no hardware was broken. He

stated that Cellebrite was the tool that he used to conduct the analysis and produce reports, and he provided a Cellebrite report and CMS reports, but did not prepare a narrative report.

{¶ 106} When asked about how he ensures that what is on the phone is the same as in the Cellebrite report, Swauger explained that he "basically make[s] a copy of the device memory or extract[s] the raw device memory. Everything's assigned a unique number and then when we produce the report, that unique number matches the unique number that's assigned to the evidence when it comes in." Swauger stated that for three of the devices he received, they did a "full forensic image," which is an "exact copy" of the phone. He indicated that the Cellebrite tool is an automated process, and it does not provide him the ability to change or manipulate the data.

{¶ 107} Swauger testified that he had been designated an expert in digital forensics, data recovery, and digital investigation in the past, and would give an opinion that the forensic extraction was a true and accurate copy of the original as of the time of collection. He agreed that he had "lots of training * * * over the years and lots of experience over the years." His forensic training was needed to learn the principals of the profession, including how to preserve evidence and the standards for recovery.

{¶ 108} After the completion of his questioning, defense counsel renewed his objection, stating that he had received no report showing Swauger's processes or procedures. Counsel reasoned that Swauger had specialized knowledge and training needed to prepare the phone and extract the data using Cellebrite, and that Swauger's opinion that the report was a fair and accurate copy was an expert opinion. The court disagreed that Swauger's anticipated testimony constituted expert testimony and

overruled the objection.

{¶ 109} Swauger then testified before the jury about his extraction of data using Cellebrite. He described how Cellebrite works, stating that it accesses the real device memory, makes a copy of the device's memory, and "the software will basically take[ ] all the zeros and ones and convert it into human readable form." Swauger stated that he was able to access and extract data from four of the five devices he was given (he was unable to access Robinson's phone). Two other devices did not have data for the period between March 27 and 28, 2020. As for Denny's phone, Swauger testified that the screen was badly damaged, but the internal components were undamaged. He produced a report that showed 104 phone records between 7:42 a.m. to 10:43 a.m. on March 28, 2020. State's Ex. 177-A. Swauger stated that records within that time period included Facebook Messenger records and that Hatfield was one of the participants in those conversations. Finally, Swauger testified regarding the March 28 audio recording located on Courtney's phone. State's Ex. 177-C.

{¶ 110} A lay witness may testify about opinions or inferences that are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. In *State v. Hemmelgarn*, 2d Dist. Darke No. 2018-CA-7, 2019-Ohio-2034, ¶ 34, we held that a trial court did not err in allowing an individual to testify as a lay witness about his use of the Cellebrite program to extract cell phone data. We reasoned, in part:

> * * * In the present case, most of [Greenville Police Officer] Marion's
> testimony did not even involve opinions or inferences. He simply testified,
> factually, about extracting data from Hemmelgarn's phone using the

Cellebrite program and listing that data in a generated report. All witnesses may testify as to facts within their personal knowledge. Evid.R. 602. To the extent that Marion did offer "opinion" testimony, he essentially opined that Cellebrite copies data from a phone. He based this "opinion" on knowledge he acquired through his own use of the program. Marion's testimony did not require a specialized understanding of the Cellebrite program, as the idea that data can be extracted from a cell phone is familiar to most people. Finally, to the extent that Marion arguably conducted any "analysis" of the data, he merely testified that a generated report showed content that had been extracted from the phone and content that had been deleted prior to examination. Again, this factual testimony did not involve any real opinions requiring specialized knowledge, training, or experience. Therefore, we agree with the trial court that Marion did not need to be qualified as an expert to testify about his use of the Cellebrite program in this case.

*Id.* at ¶ 34. We noted that the Fourth and Eighth Districts had reached similar conclusions, stating that expert testimony was unnecessary to describe the extraction of cell phone data using the Cellebrite program.

{¶ 111} As in *Hemmelgarn*, Swauger's testimony was factual in nature. He provided factual information about his extraction of data from four cell phones and described the information that was found. To the extent that Swauger arguably conducted any "analysis" of the data, he testified that he provided reports of data within specific time periods that were relevant to the case. On this record, the trial court did not err in permitting Swauger to testify as a lay witness. Consequently, Swauger was not

required to provide an expert report pursuant Crim.R. 16(K).

{¶ 112} Hatfield's second assignment of error is overruled.

### IV. Jury Instruction on Aiding and Abetting

{¶ 113} In his third assignment of error, Hatfield claims that the trial court erred in its jury instruction on aiding and abetting on the ground that it "did not conform to the evidence presented at trial" and the instruction on the term "cause" created juror confusion.

{¶ 114} Jury instructions "must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181, 657 N.E.2d 503 (1995). A trial court must fully and completely give jury instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact-finder. *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus; *State v. Portis*, 2d Dist. Montgomery No. 28677, 2021-Ohio-608, ¶ 46.

{¶ 115} We review a trial court's jury instructions for an abuse of discretion. *Portis* at ¶ 47, citing *State v. Jones*, 2015-Ohio-5029, 52 N.E.3d 263, ¶ 13 (12th Dist.). "An appellate court may not reverse a conviction in a criminal case based upon jury instructions unless 'it is clear that the jury instructions constituted prejudicial error.' " *Id.* We must review the instructions as a whole, and, if taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found premised upon the possibility that the jury may have been misled. *Id.*

{¶ 116} The court discussed the draft jury instructions with the parties on the morning of Thursday, October 1, 2020. The jury instructions stated that Hatfield was

"charged with complicity and/or as the principal offender with the commission of murder and a number of Underlying Felony offenses resulting in the death of David Robinson. He is charged two ways: being the principal offender who committed all the acts of such felonies resulting in the death of David Robinson or as an accomplice in the commission of these felonies. There are other crimes charging the Defendant as a principal or complicit that did not result in the death of David Robinson. Thus, you are to determine whether the state has proved beyond a reasonable doubt, that the defendant, Dustin Hatfield, was the principal offender or knowingly aided and abetted (complicity) another person or persons in the commission of the offenses set forth below."

{¶ 117} The jury instructions included a three-paragraph instruction on aiding and abetting. Hatfield did not object to the court's proposed language, and he acknowledges on appeal that the trial court's jury instruction correctly stated the law applicable to aiding and abetting. Specifically, he states that "[t]he jury instructions, as to complicity, in this case, correctly stated throughout that Hatfield had to have the same knowledge as the principal offender and had to have taken some active role in causing the commission of the crime." Given our conclusion that the State presented sufficient evidence to support the felony murder and failure to comply convictions based on complicity, we find no error in the court's provision of a complicity instruction.

{¶ 118} Hatfield's primary argument is that the court erred in its instruction on causation. In setting forth the charged offenses, the jury instructions began with murder as a proximate result of felonious assault (serious physical harm). The instruction stated that, "[b]efore you can find the defendant guilty, you must find beyond a reasonable doubt that on or about March 28, 2020, and in the County of Montgomery, State of Ohio, the

defendant, acting as a principal, or aiding and abetting another person, caused the death of David Robinson as a proximate result of committing or attempting to commit the offense of Felonious Assault Serious Physical Harm." After articulating the elements of the offense, the section provided definitions for "cause," "proximate result," "attempt," and "knowingly." The section also addressed such matters as "natural consequence," "other causes not a defense," the effect of intervening causes, how to determine knowledge, and motive.

{¶ 119} Defense counsel objected to the proposed instruction on cause, which read: "CAUSE is an essential element of the offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces physical injury to a person and without which it would not have occurred." Tr. at 841. Counsel requested that the phrase "failure to act" be removed from that definition and from several other paragraphs that used the language "an act or failure to act," such as the instructions on "natural consequences," "other causes not a defense," and "intervening causes."

{¶ 120} In response, the prosecutor argued that "because complicity is part of all of these crimes, and because the complicity instruction allows the jury to consider the circumstances surrounding it and including how they were together before, during, and after the events that caused what he did and did not do, might be things relevant to a juror's consideration even where there's no duty." Tr. at 841-842. The court ruled that it was "leaving it as it is." Tr. at 842.

{¶ 121} During deliberations, the jury posed questions to the court on two separate occasions. The first set of questions is not at issue. At 11:53 a.m. on Friday, October 2, the parties received notice that the jury had sent a second set of questions, which

asked the following:

> Does it have to be proven that the defendant was acting as a principal, or aiding and abetting another person that caused the death
>
> OR
>
> Does merely not doing anything after the crime count?   Could anyone be charged if not doing anything?   In the cause section it says it is an act or failure to act which in a natural and continuous sequence directly produces physical injury to a person and without which it would not have occurred.
>
> Did he have to know the crime was going to be committed? Or does intent not matter in this case?

Court's Ex. VI.   The court and counsel discussed the questions for nearly two hours (the jurors were eating lunch during a portion of this time).   The agreed response was "To commit the underlying felonies of felonious assault and/or aggravated robbery, an act is required, as either a principal or aider and abetter."   *Id*.; Tr. at 982-983.   However, at approximately 1:45 p.m., just prior to the communication of the response to the jury, the court received word that the jury had reached a verdict without an answer to its questions. Tr. at 983, 990.

{¶ 122} After the jury was assembled in the courtroom, the trial court made a record of what had occurred regarding the jury's questions and asked the jury foreperson, "Do you think it would be wise, or not, needed or not, that you receive that answer, prior to you disclosing what your verdicts are?"   The foreperson responded, "I don't think so, Your Honor."   The court then asked, "Anybody here feel different, jury-wise, raise your hand."   The court received no response.   Tr. at 993.   The trial court held a brief sidebar,

during which defense counsel stated that he had "nothing to add." The verdicts were then announced.

{¶ 123} Hatfield asserts that the jury evidently believed that he was complicit in the murder of Robinson for failure to act, as evidenced by the jury's "inconsistent jury verdicts as to aiding and abetting and the evidence presented in this case." Hatfield notes that, given that the gunshot wound was immediately fatal and irreparable, a verdict against him for failure to act would be unsupported by the evidence. He maintains that "the inconsistent verdicts as to [his] non-involvement proves that there was confusion as to the trial court's instructions, which the court should have cleared up prior to disclosing the jury's verdicts." To summarize, Hatfield does not appear to argue that the trial court's instruction on "cause" was an inaccurate statement of the law. Rather, he states that inclusion of "or failure to act" was not applicable to the evidence presented at trial, created juror confusion, and resulted in his conviction for murder due to his failure to act.

{¶ 124} Here, the trial court gave the standard instruction on "cause" as set forth in Ohio Jury Instructions. While we might agree with Hatfield that the phrase "or failure to act" should have been removed from the jury instructions, as defense counsel requested, we disagree that its inclusion amounted to reversible error.

{¶ 125} Three Ohio appellate districts have held that the inclusion of "failure to act" arises only to harmless error where there is evidence before the jury that the defendant committed an overt act. In *State v. Head*, 11th Dist. Lake No. 2001-L-228, 2005-Ohio-3407, *reversed on other grounds, In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174, the defendant drove Shawn Hall from place to place in exchange for free drugs. On June 26, 2001, she drove Hall and others

to find James Beres, who allegedly had "ripped off" Hall's brother, another drug dealer. The group found Beres, forced him into the van, and assaulted him in the van. After Hall told Head to stop the van, the group (minus Head) left the van, assaulted Beres, returned to the van without Beres, and left. Head and Hall later returned to that location and found Beres dead. The group again gathered at Head's home, and Beres's body was later transported to another location in someone else's car.

{¶ 126} Head was found guilty, as an accomplice, of two counts of murder (proximate result of kidnapping and of felonious assault), one count of kidnapping, and one count of felonious assault. On appeal, she challenged the trial court's jury instruction on "cause," arguing that the inclusion of "failure to act" language was erroneous. She contended that "a conviction under the complicity statute requires an overt act and the failure to act, absent a duty, does not constitute complicity." *Head* at ¶ 39. Viewing the jury instructions as a whole, the Eleventh District rejected Head's argument. It reasoned: "Where the jury is given a thorough instruction regarding the underlying offenses as well as the complicity requirements and the cause instruction included 'act,' the incorporation of 'failure to act' when there is no duty to act rises only to harmless error where there is evidence before the jury that the defendant committed an overt act." *Id.*, following *State v. Sipos*, 9th Dist. Wayne Nos. 2238, 2239, 1987 WL 15593, *3 (Aug. 5, 1987).

{¶ 127} Similarly, in *State v. Brown*, 10th Dist. Franklin No. 94APA03-298, 1994 WL 672714 (Nov. 29, 1994), the defendant claimed that the inclusion of "failure to act" language in the definition of causation was improper, because it allowed the jury to infer that his failure to assist the victim or to prevent his co-defendant from attacking the victim was grounds for finding causation. The Tenth District found no prejudicial error, first

finding that the court's instructions were correct statements of the law. The court further stated that, "[a]lthough the phrase "failure to act" was arguably improper and objectionable as a definition of causation in this case, it was superfluous and non-prejudicial" given that evidence was presented that Brown threw the fatal punch. *Id*. at *3.

{¶ 128} In this case, the trial court's jury instructions, when viewed as a whole, were correct statements of the law. As with *Head* and *Brown*, while the inclusion of the phrase "failure to act" was arguably objectionable, the inclusion of that language was merely superfluous. The State presented evidence from which the jury could have concluded that Hatfield was the principal offender. Even if the jury had determined that Denny was the shooter, the State's evidence supported a conclusion that Hatfield had engaged in overt acts – such as providing the gun used in the shooting, jointly seeking out Robinson at Ewing's residence, and discarding the gun after the shooting – such that he was complicit in Denny's murder of Robinson.

{¶ 129} Hatfield nevertheless contends that the jury's questions during deliberations and ultimate verdicts indicated that it was misled by the inclusion of "failure to act," resulting in reversible error. After the jury submitted questions about causation and the phrase "failure to act," the jury deliberated for at least another hour and was able to reach a verdict on each offense. When asked by the court if the jury needed an answer to its questions before the verdicts were read, the jury foreperson responded "I don't think so," and no juror disagreed. At this juncture, whether the jury may have been misled by the causation instruction is speculative. We cannot reverse where there is only a possibility that the jury was misled.

{¶ 130} Hatfield's third assignment of error is overruled.

## V. Allied Offenses of Similar Import

{¶ 131} In his fourth assignment of error, Hatfield claims that the trial court erred in failing to merge the offenses of having weapons while under disability and tampering with evidence (handgun).

{¶ 132} The allied-offense statute, R.C. 2941.25, provides:

(A) Where the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

This statute implements the protections of the Double Jeopardy Clauses of the United States and Ohio Constitutions, which prohibit a second punishment for the same offense. *State v. Fritz*, 182 Ohio App.3d 299, 2009-Ohio-2175, 912 N.E.2d 650, ¶ 9 (2d Dist.).

{¶ 133} "As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to

any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31; *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12 (quoting *Ruff*); *State v. Davison*, 2d Dist. Montgomery No. 28579, 2021-Ohio-728, ¶ 29. Offenses are of dissimilar import within the meaning of the allied-offense statute "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23.

{¶ 134} The defendant bears the burden of establishing that offenses should be merged as allied offenses. *State v. Albertson*, 2d Dist. Montgomery No. 28722, 2021-Ohio-2125, ¶ 95. We review the trial court's merger ruling de novo. *State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, ¶ 10.

{¶ 135} With respect to having weapons while under disability and tampering with that weapon, "[t]he cornerstone of the analysis is whether the evidence reflects that an offender acquired a firearm 'at some time prior' to concealing the firearm to impair its availability as evidence in a proceeding or investigation." *State v. Frye*, 2018-Ohio-894, 108 N.E.3d 564, ¶ 133 (3d Dist.). When the act of concealing the weapon is a separate and distinct act from initially acquiring it, the two offenses are not allied offenses of similar import. *See State v. Wilcox*, 2d Dist. Clark No. 2013-CA-94, 2014-Ohio-4954, ¶ 19 (defendant committed having weapons while under disability when he acquired the gun before entering the SUV and committed tampering with evidence when he hid the gun under the driver's seat). Courts have found the two offenses merge only when a defendant acquired the firearm "with an immediate, virtually simultaneous intent to conceal it to impair its availability as evidence in an investigation." *E.g., Frye* at ¶ 134.

{¶ 136} Hatfield believes that the evidence established that he was only in possession of the Glock to dispose of it. He focuses on the evidence that he was seen throwing items from the passenger side of the Grand Marquis during the high-speed chase and that pieces of the firearm were located along Interstate 75.

{¶ 137} The evidence at trial was not as clear as Hatfield portrays. The fatal shots were fired from a Glock 9mm handgun belonging to Hatfield's wife, Courtney. The gun case for the weapon was located at the couple's home in their primary bedroom. Although Ewing apparently saw Denny, not Hatfield, with a firearm, it is unclear whether Hatfield took the gun and provided it to Denny or whether Denny stole it when he was at Hatfield's home on March 27, 2020. Hatfield made statements that he stole the gun and committed the murder, but he also made statements suggesting that those admissions were falsely made due to rumors that he was snitching. The evidence reasonably supported several different conclusions, including a conclusion that Hatfield possessed the Glock 9mm firearm prior to his dismantling the gun and throwing its pieces out the car window along Interstate 75. Accordingly, the trial court did not err in failing to merge the offenses of having weapons while under disability and tampering with evidence (handgun) as allied offenses of similar import.

{¶ 138} Hatfield's fourth assignment of error is overruled.

## VI. Consecutive Sentences

{¶ 139} Hatfield's fifth assignment of error claims that the trial court erred in imposing consecutive sentences because the record does not support the court's findings under R.C. 2929.14(C)(4).

{¶ 140} In reviewing felony sentences, appellate courts must apply the standard of

review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law. *State v. Huffman*, 2d Dist. Miami No. 2016-CA-16, 2017-Ohio-4097, ¶ 6.

{¶ 141} In general, it is presumed that prison terms will be served concurrently. R.C. 2929.41(A); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 16, 23 ("judicial fact-finding is once again required to overcome the statutory presumption in favor of concurrent sentences"). However, after determining the sentence for a particular crime, a sentencing judge has discretion to order an offender to serve individual counts of a sentence consecutively to each other or to sentences imposed by other courts. *State v. Dillon*, 2d Dist. Greene No. 2020-CA-4, 2020-Ohio-5031, ¶ 44.

{¶ 142} R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive sentencing is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or

was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 143} In imposing consecutive sentences, the trial court made the required statutory findings. The court found, both orally and in its judgment entry, that consecutive sentences were necessary to protect the public or to punish Hatfield and that consecutive sentences were not disproportionate to the seriousness of his conduct and to the danger that he posed to the public. Additionally, the court found that (1) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses was so great and unusual that no single prison term could adequately reflect the seriousness of his conduct and (2) Hatfield's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crime by him.

{¶ 144} On appeal, Hatfield argues the record does not support the trial court's findings under R.C. 2929.14(C)(4)(b) and (c). Specifically, he states that, while his actions were "reprehensible" after the fact, there was no evidence that he shared Denny's plan to shoot and kill Robinson, and he highlights that the jury found that he did not

possess or use a weapon in committing the murder and felonious assault. Hatfield further asserts that his most recent prior conviction was more than 10 years old and his criminal history did not merit consecutive sentences. As an additional argument, Hatfield claims that the imposition of consecutive sentences under the circumstances here would demean the seriousness of other more violent crimes and harms to other victims.

{¶ 145} Before we turn to Hatfield's specific arguments, we note that Hatfield's challenges to the findings under R.C. 2929.14(C)(4) are not applicable to the sentences for two counts of tampering with evidence, failure to comply with an order or signal of a police officer, and the firearm specification accompanying tampering with evidence (handgun). The trial court ordered two counts of tampering with evidence (cell phone and pill bottle with money) to be served concurrently with, not consecutively to, the third tampering with evidence (handgun) sentence and to the murder. The trial court was required to impose the one-year firearm specification accompanying the tampering with evidence (handgun) offense consecutively, pursuant to R.C. 2929.14(C)(1)(a). Additionally, by statute, when failure to comply is a third-degree felony and the offender is sentenced to prison, the prison term for failure to comply must be served "consecutively to any other prison term or mandatory prison term imposed upon the offender." R.C. 2921.331(D). Accordingly, the trial court's findings under R.C. 2929.14(C)(4) have no bearing on those sentences.

{¶ 146} Turning to Hatfield's arguments, we conclude that the imposition of consecutive sentences based on his history of criminal conduct was not clearly and convincingly unsupported by the record. At the time of the March 28, 2020 offenses, Hatfield was 27 years old. When he was 15 years old, he was adjudicated delinquent

once each for obstructing official business (November 2007), assault (November 2007), and underage possession of intoxicating liquor (January 2008), and twice for domestic violence (January and April 2008). Hatfield was adjudicated delinquent for possession of marijuana when he was 16 years old.

{¶ 147} In 2010, when Hatfield was 18 years old, he committed several misdemeanor offenses: aggravated menacing (May), disorderly conduct (May), domestic violence (June), and attempted assault (August). He received jail sentences for each of the offenses.

{¶ 148} In December 2011, at age 19, Hatfield was convicted in Clark County of reckless homicide and tampering with evidence, both felonies of the third degree; additional charges of having weapons while under disability and possession of drugs were dismissed. According to the presentence investigation report (PSI), Lori Estepp had been found shot to death in her home, and Hatfield had wiped the gun and attempted to hide the firearm immediately thereafter. The Clark County court sentenced him to consecutive sentences totaling five and a half years in prison. The PSI stated that Hatfield was released from prison on March 4, 2019, but that date appears to be inaccurate.

{¶ 149} On October 12, 2018, Hatfield was convicted in Greene County of domestic violence, a felony of the fourth degree; additional counts of felonious assault and felony domestic violence were dismissed. The court sentenced him to 9 months in prison, and he was released on July 11, 2019. Hatfield committed the instant offenses approximately nine months later.

{¶ 150} Upon review of Hatfield's criminal history, we cannot conclude that the trial

court's finding was clearly and convincingly unsupported by the record. Hatfield has a history of violent offenses, both as a juvenile and an adult. Hatfield received three separate jail sentences for aggravated menacing, disorderly conduct, domestic violence, and attempted assault, which occurred over the span of a year. As an adult, Hatfield had spent more time in prison than not, and his prior felony offenses included reckless homicide, domestic violence, and tampering with evidence (gun). The record amply supported the trial court's conclusion that Hatfield's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crime by him.

{¶ 151} Having found that the trial court's finding under R.C. 2929.14(C)(4)(c) was not clearly and convincingly unsupported by the record, we need not address the trial court's additional finding under R.C. 2929.14(C)(4)(b). Moreover, we find no merit to Hatfield's argument that consecutive sentences in this case would demean the seriousness of the offenses.

{¶ 152} Hatfield's fifth assignment of error is overruled.

### VII. Conclusion

{¶ 153} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P. J. and DONOVAN, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Ben M. Swift
Hon. Richard S. Skelton